**2012-1289**

# United States Court of Appeals
# for the Federal Circuit

BIOSIG INSTRUMENTS, INC.,

*Plaintiff-Appellant,*

*v.*

NAUTILUS, INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the Southern District of New York in Civil Case No. 10-CV-7722, Judge Alvin K. Hellerstein*

**SUPPLEMENTAL BRIEF OF DEFENDANT-APPELLEE NAUTILUS, INC. FILED PURSUANT TO THE COURT'S JULY 8, 2014 ORDER**

JAMES E. GERINGER
JEFFREY S. LOVE
JOHN D. VANDENBERG
PHILIP WARRICK
KLARQUIST SPARKMAN, LLP
One World Trade Center
Suite 1600
121 S.W. Salmon Street
Portland, OR 97204
(503) 595-5300

Attorneys for Defendant-Appellee
Nautilus, Inc.

August 15, 2014

**FORM 9.  Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BIOSIG INSTRUMENTS, INC.    v. NAUTILUS, INC.

No. 2012-1289

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Nautilus, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Nautilus, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

KLARQUIST SPARKMAN, LLP: James E. Geringer, John D. Vandenberg, Jeffrey S. Love, Philip Warrick
JOHNSON GALLAGHER MAGLIERY, LLC: Peter J. Gallagher, Joshua Sivin

| May 28, 2013 | /s/Jeffrey S. Love |
| Date | Signature of counsel |
| | Jeffrey S. Love |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: _____

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................1

BACKGROUND .............................................................................2

ARGUMENT ..................................................................................7

I.    THE SUPREME COURT'S DECISION
      REQUIRES A MORE DEMANDING ANALYSIS ...........................8

      A.    The Supreme Court Held That
            Section 112 Mandates Clarity And Precision ............................8

      B.    The Supreme Court Held That Section 112 Requires
            Reasonable Certainty Based On The Intrinsic Evidence ...........9

      C.    The Supreme Court Held That Poor Claim
            Drafting Does Not Excuse Unclear Or Imprecise Claims ........10

      D.    The Supreme Court Declared The
            Objective Of Eliminating The Incentive For
            Patent Applicants To Draft Ambiguous Claims .......................11

      E.    These Mandates Necessitate A
            Different And Stricter Evaluation Of The Claims ....................11

II.   APPLYING THE SUPREME COURT'S STANDARD
      HERE, A SKILLED ARTISAN COULD NOT
      DETERMINE THE SCOPE OF THE CLAIMS
      WITH REASONABLE CERTAINTY IN 1992 ................................14

      A.    The Claims' Scope Was Unclear
            Regarding The Electrodes' Spacing
            And Its Link—If Any—To The Claimed Result .......................14

            1.    Some Clues Suggested
                  That The Spacing Was Critical .......................................14

2.     Other Clues Suggested That
The Spacing Was *Not* Critical ........................................17

B.     Simply Choosing One Of These
Competing Interpretations Would Not
Provide Reasonable Certainty At The Time Of Filing .............18

1.     Even Assuming The Spacing Were Clearly
Critical, The Claims' Scope Remained Unclear ............18

2.     Even Assuming The Spacing Were Clearly *Not*
Critical, The Claims' Scope Remained Unclear ............20

III.   MR. LEKHTMAN WAS IN THE BEST POSITION TO
AVOID THIS AMBIGUITY, YET HE FAILED TO DO SO ...........21

A.     The Uncertainty Was Avoidable................................................21

B.     Biosig's Roller-Coaster Claim-Scope
Positions Illuminate The Uncertainty .......................................23

C.     Enablement Is Not The Same As Clarity And Precision..........24

IV.    UPHOLDING THESE CLAIMS WOULD
FUEL THE TEMPTATION FOR PATENT
APPLICANTS TO GAIN ECONOMIC
LEVERAGE THROUGH CLAIM-SCOPE OBFUSCATION ..........24

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) ........................................................................16

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) ...........................................................................2

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002) .............................................................................................9

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
  304 U.S. 364 (1938) ................................................................................ 9, 20, 21

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) ................................................................ 11, 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ................................................................................ passim

*Phillips Corp. v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................22

*United Carbon Co. v. Binney & Smith Co.*,
  317 U.S. 228 (1942) ..................................................................................... 9, 18

**Statutes**

35 U.S.C. § 112 ............................................................................................ passim

**Other Authorities**

Federal Trade Commission, *The Evolving IP Marketplace:*
  *Aligning Patent Notice and Remedies With Competition* 85 (2011) ...................11

Jeffrey G. Sheldon, *How to Write a Patent Application* § 6.5.19 (2005) ................24

iv

# INTRODUCTION

The Supreme Court has interpreted the Patent Statute's "clarity and precision demand" as requiring greater clarity and precision than this Court has required. The patent claims here fail that mandate. Instead, they recite a desired result without clearly defining how to achieve it. For instance, they may require some special spacing of electrode elements to achieve that result, or they may not. The intrinsic evidence presented the skilled artisan in 1992 with unclear and conflicting clues about that question and the reach of these claims.

Post-issuance events cannot retroactively cure a patent claim's lack of clarity and precision the day it issued. Nor can they remedy the post-issuance loss of follow-on innovations. But, they can help illustrate the uncertainty causing this loss. Here, Mr. Lekhtman's declaration 15 years after the patent issued shows that greater clarity and precision were easily possible when he filed his patent application in 1992. And, the internally inconsistent claim-scope positions of Mr. Lekhtman, Biosig, and Biosig's expert witnesses illustrate both the ambiguity and its harmful consequences.

On this record, under the Supreme Court's standard, the trial court was right to grant summary judgment that these patent claims are *not* particular and distinct. To reverse that judgment would defeat the Supreme Court's stated goal of eliminating the powerful incentives to draft unclear, imprecise patent claims.

1

# BACKGROUND

The context for application of the Supreme Court's standard to this patent includes the close prior art, the intrinsic evidence, and certain post-issuance events and statements.

The Prior-Art (Fujisaki) Heart-Rate Monitor: The skilled artisan is presumed to know the closest prior art.[1] Here, that art includes the prior-art heart-rate monitor of U.S. Patent No. 4,444,200 ("Fujisaki") (JA977-83). Fujisaki discloses two pairs of spaced surface electrodes wired to a differential amplifier. One pair is grasped by a user's left hand and the other by the right hand. (JA981, at 1:30-33.) A differential amplifier receives two input signals and subtracts one from the other to produce a single output signal. Thus, it eliminates two input signals that are equal in magnitude and polarity (e.g., $2 - 2 = 0$) but amplifies two signals that are unequal (e.g., $2 - -2 = 4$). The prior-art Fujisaki design beneficially used this subtraction function to substantially eliminate "noise" signals that could otherwise mask heart signals. (JA981-82, at 2:64-3:2.) To the extent they are equal, these "noise" signals are eliminated by the differential amplifier. In contrast, because the electrical signals emanating from the heart are of different polarity at the two hands

---

[1] *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art.").

(i.e., one is positive while the other is negative), this circuitry beneficially amplifies those heart (ECG) signals.

The Alleged Shortcoming Of The Prior Art: The asserted "Lekhtman patent," U.S. Patent No. 5,337,753 (JA1-15), describes the same configuration of four surface electrodes and a differential amplifier as Fujisaki. Biosig has not denied this. (*See, e.g.*, JA192.) But, Biosig alleges that the Lekhtman invention solves a problem that Fujisaki did not, concerning the elimination of the effects of muscle artifact known as electromyogram (EMG) signals, purportedly caused by users moving their arms or squeezing the heart-rate monitor with their fingers while exercising. (*See* JA12, at 1:19-25.)

The Issued Claims: Claim 1 of the Lekhtman patent recites, in material part, the prior-art design of a differential amplifier wired to two pairs of spaced surface electrodes as described in Fujisaki. The claim also recites a result: the muscle (EMG) signals detected at the two pair of electrodes are "substantially equal" (so that they are substantially eliminated by the differential amplifier's subtraction function). (JA14.) More specifically, the claim recites, after reciting the structural aspects of the circuit: "whereby a first [EMG] signal will be detected between [the two electrodes of a first electrode pair], and a second [EMG] signal, of substantially equal magnitude and phase to said first [EMG] signal will be detected between the [the two electrodes of the second electrode pair] . . . ." (*Id.*)

3

The claim requires that the two electrodes at each hand are spaced from each other. Specifically, it recites that both EMG signals and ECG signals are "detected between" these two distinct electrodes, namely a "first live electrode" ("connected to" a "difference amplifier") and a "first common electrode" ("connected to . . . a point of common potential"). (*Id.*) The claim also requires that the two electrodes are close enough together so that they can be grasped by a single hand. (*See id.* (reciting "with one hand of the user . . . contacting said first live electrode and said first common electrode").) In addition, the claim recites that the two electrodes in an electrode pair are "in spaced relationship with each other." (*Id.*)

The 1992 Patent Application: Mr. Lekhtman filed his patent application in 1992, disclosing the same four-electrode and differential-amplifier circuit as Fujisaki but stating that the muscle (EMG) signals detected between the electrodes in an electrode pair were of "substantially equal amplitude and phase." (JA23.) The application did not say *why* these detected EMG signals were substantially equal.

Other than identifying some possible shapes for the electrodes, Mr. Lekhtman's 1992 application described no specific embodiments of the electrodes. It did not identify any particular electrode material, or size (width), or spacing (between the electrodes). Nor did it say whether any of these characteristics of the electrodes affected the desired result. The drawings showed the surface electrodes

4

being spaced apart more widely than the width of an electrode, but the application did not mention that characteristic or indicate that it was significant.

The application did not define "in spaced relationship with each other."

The Original Prosecution History: The examiner noted that "the placement of the electrodes in claim 1 *appears not to be critical* to the proper functioning of the device, and as such is regarded as merely a desing [sic, design] choice." (JA75 (emphasis added).) Biosig responded by arguing that the cited reference failed to show the circuit configuration of four electrodes wired to a differential amplifier as shown in the Lekhtman patent. (*See* JA84-86.) Fujisaki was not cited.

The Reexamination: Some 15 years after the patent issued, Mr. Lekhtman distinguished Fujisaki in reexamination proceedings, explaining his invention to the Patent Office as follows: The EMG (muscle) signals on the left and right palms are *unequal*. (JA233, ¶ 40; JA242, ¶ 82.) Were those unequal muscle signals accurately captured and transmitted to the differential amplifier, it would amplify their differences and thereby mask the heart-rate signal that is supposed to be measured. (JA240, ¶ 71.) But, by carefully configuring the electrodes *a priori*, it is possible to detect substantially *equal* EMG signals that can then be eliminated by the differential amplifier. (*Id.*) His invention, he said in 2009, was that "one must through trial and error configure the electrodes such that the inherently unequal EMG waveforms are equalized as detected on the left and right hands." (*Id.* ¶ 74.)

Possible electrode configurations are tested until "the optimum configuration of the spacing, size, shape and materials" of the electrodes is found for equalizing (balancing) the detected EMG signals. (JA238-39, ¶ 68.) This "pre-balancing" of the electrodes "is the unanticipated and non-obvious key to the inventive concept." (JA200; *see also* JA242, ¶ 82 (characterizing this as his "inventive concept and the advance relative to the state of the art"); JA157; JA223.)

Mr. Lekhtman also described testing performed on a model built to represent the electrodes depicted in Fujisaki. He concluded that this model sufficiently reduced EMG signals—and could "provide acceptable heart rate measurements"— when a user gripped the electrodes "with relaxed hands." (JA255-56.) In his view, however, when his Fujisaki model was tested with stronger "grasping," the EMG signals were *not* sufficiently reduced. (*See id.*; JA343.) Mr. Lekhtman faulted Fujisaki's wide, closely spaced electrodes for this alleged failure, which he contrasted with the wider spacing depicted in his own patent. (JA241, ¶¶ 76-79.)

The District Court Litigation: Biosig successfully urged the court to construe the term "spaced relationship" broadly as any "defined relationship" (JA-E), rather than adopt Mr. Lekhtman's statement in the reexamination that "the space between electrodes is wider than the width of each electrode" (JA241, ¶ 79). But then, in opposing summary judgment, Biosig urged a narrower interpretation, contending that the claim term "spaced relationship" limited the electrodes' spacing to a

special spacing, tied to the claimed result of detecting and cancelling out substantially equal EMG signals. (*See, e.g.*, JA2827; JA2836.) The court rejected Biosig's arguments: "[T]his is all a description of the desired result and not a description of any invention that is calculated . . . to produce that result and, therefore, violates the requirement of specificity in Section 112." (JA2829-30.)

Biosig submitted reports from two experts. Dr. Yanulis—after citing the "insolubly ambiguous" standard—endorsed *both* the trial court's "defined relationship" construction and Biosig's new result-based construction, saying the person of skill in the art "could readily discern" the former scope and "could easily discern" the latter scope. (JA1670.) Dr. Galiana presented a "model" of the Lekhtman invention, with relatively narrow electrode spacing resembling that shown in Fujisaki (and with the same electrode circuit configuration as Fujisaki). (*See* JA1048-49.)

## **ARGUMENT**

The Supreme Court requires clarity and precision in patent claims—as viewed through the eyes of the skilled artisan at the time of filing and in light of the specification and file history. Here, the asserted claims recite a desired *result*— detecting substantially equal EMG muscle signals between the electrodes for each hand—without clearly reciting a *particular way* of achieving that result. The claims recite that the electrodes are "in spaced relationship with each other," but do

not (read in the context of the specification and original prosecution history) define what this means or explain if or how this "spaced relationship" contributes to the claimed result. As explained below, the intrinsic evidence provided the skilled artisan in 1992 with strong clues pointing in opposite directions. Some indicated that "in spaced relationship" denotes some special spacing causing the desired result. But others indicated that "in spaced relationship" is merely superfluous and does not restrict how the claimed result is achieved. The post-issuance proceedings and declarations serve to illustrate the existence and avoidability of this ambiguity and imprecision at the time of filing.

## I.    THE SUPREME COURT'S DECISION REQUIRES A MORE DEMANDING ANALYSIS.

### A.    The Supreme Court Held That Section 112 Mandates Clarity And Precision.

The Supreme Court's decision requires a different and less forgiving evaluation of the asserted claims. The Supreme Court held "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with *reasonable certainty*, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) ("*Nautilus II*") (emphasis added). And, it expressly rejected this Court's previous "formulation, which tolerates some ambiguous claims but not others." *Id.*; *see also id.* at 2130 ("[W]e must ensure that

the Federal Circuit's test is at least probative of the essential inquiry. Falling short in that regard, the expressions 'insolubly ambiguous' and 'amenable to construction' permeate the Federal Circuit's recent decisions concerning §112, ¶ 2's requirement." (internal citation and quotation marks omitted)).

This decision re-invigorated the public-notice function of the particular-and-distinct claiming requirement, and warned against "the innovation-discouraging 'zone of uncertainty,'" *id.* (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)), fostered when courts "tolerate imprecision just short of that rendering a claim 'insolubly ambiguous.'" *Id.* In other words, "a patent must be precise enough to afford clear notice of what is claimed." *Id.* at 2129. This requirement of clarity and precision protects both patentees and "the inventive genius of others," as part of Section 112's "delicate balance." *Id.* at 2128-29 & n.6 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002); *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938)).

### B.    The Supreme Court Held That Section 112 Requires Reasonable Certainty Based On The Intrinsic Evidence.

The Supreme Court emphasized that it must be the *claims themselves* (in light of the specification and file history), and not a court's post-issuance *construction* of those claims, that provide the requisite clarity and precision. Moreover, "[d]efiniteness is measured from the viewpoint of a person skilled in

[the] art *at the time the patent was filed.*" *Id.* at 2128 (quotation omitted); *see also id.* at 2130 ("It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan *at the time of the patent application, not that of a court viewing matters post hoc.*" (second emphasis added)). This requirement precludes patentees from relying on post-issuance explanations to clarify ambiguities in the issued patent and original prosecution history when viewed through the lens of the skilled artisan at the time of filing. Post-issuance clarifications cannot undo the damage done to follow-on innovation starting the very first day the patent issued.

### C.   The Supreme Court Held That Poor Claim Drafting Does Not Excuse Unclear Or Imprecise Claims.

The Supreme Court rejected one of this Court's justifications for the permissive "insolubly ambiguous" standard: "protect[ing] the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 902 (Fed. Cir. 2013) ("*Nautilus I*") (quotation omitted), *vacated, Nautilus II*, 134 S. Ct. 2120. The Supreme Court expressly rejected the premise that the statutory presumption of patent validity justifies this lenient approach, holding that the "presumption of validity does not alter the degree of clarity that § 112, ¶ 2 demands from patent applicants." *Nautilus II*, 134 S. Ct. at 2130 n.10.

**D.    The Supreme Court Declared The Objective Of Eliminating
        The Incentive For Patent Applicants To Draft Ambiguous Claims.**

The Supreme Court further rejected the notion that claim drafters need not be as precise as reasonably possible. Rather, while acknowledging the "inherent limitations of language," and "recognizing that absolute precision is unattainable," the Court held that patent applicants must "be precise enough to afford clear notice of what is claimed," and that the definiteness requirement "mandates clarity." *Id.* at 2128-29. The justification for this strict application flows from reports that "absent a meaningful definiteness check . . . patent applicants face powerful incentives to inject ambiguity into their claims." *Id.* at 2129; *see also* Federal Trade Commission, *The Evolving IP Marketplace:  Aligning Patent Notice and Remedies With Competition* 85 (2011) (quoting testimony regarding "an incentive to be as vague and ambiguous as you can with your claims" and "defer clarity at all costs"). The Supreme Court declared that "[e]liminating that temptation is in order, and 'the *patent drafter is in the best position to resolve the ambiguity* in . . . patent claims.'" *Nautilus II*, 134 S. Ct. at 2129 (quoting *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)) (emphasis added).

**E.    These Mandates Necessitate A Different
        And Stricter Evaluation Of The Claims.**

The Supreme Court explained that because the prior panel opinions of this Court "invoked a standard more amorphous than the statutory definiteness

11

requirement allows," it remanded for the express purpose of applying "the proper standard" as articulated in its opinion. *Id.* at 2131. The Supreme Court's decision reveals at least the following three defects of the prior panel opinions.

First, the *wrong standard* was applied. Relying on now-abrogated Federal Circuit precedent, this Court previously found that the claims could be given *constructions* that were sufficiently definite. But, the correct starting point is not to construe the claims first and then determine whether *those constructions* provide the precision and clarity that the statute demands. *See id.* at 2130 ("It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims . . . ."). Simply choosing one of several inconsistent sets of "metes and bounds" as the baseline for evaluating definiteness epitomizes the *post hoc* approach rejected by the Supreme Court. *Compare*, *e.g.*, *id.* (cautioning against "a court viewing matters *post hoc*"), *with Nautilus I*, 715 F.3d at 898 ("[A] construed claim can be indefinite if *the construction* remains insolubly ambiguous . . . ." (emphasis added) (quotation omitted)), *and id.* at 905 (Schall, J., concurring) ("[T]he . . . *construction* provided sufficient clarity to one of skill in the art as to the metes and bounds of the 'spaced relationship' limitation." (emphasis added)).

Second, the Court relied upon evidence *not available at the time of filing*— or even issuance—of the patent. *See, e.g.*, *Nautilus I*, 715 F.3d at 900 ("Even more significantly, the PTO examiner found this function to be 'crucial' as a reason for

overcoming the cited prior art and confirming the patentability of the asserted claims upon reexamination."); *id.* at 899 ("The functionality . . . which provided the basis for overcoming the PTO's office action rejections during the reexamination, sheds further light on the meaning of 'spaced relationship.'"). Statements in a reexamination 15 years later cannot help the skilled artisan seeking to innovate around the patent the day it issued.

Third, this Court relied on Biosig's own conflicting expert declarations evidencing *multiple competing interpretations* of the claims. For example, the declaration that Mr. Lekhtman submitted in 2009 to overcome Fujisaki conflicts with the earlier Dr. Galiana report. Dr. Galiana did not discuss any trial-and-error or *a priori* balancing of the electrodes used in her "model" of the Lekhtman patent, whereas Mr. Lekhtman characterized this as his "inventive concept." (JA242.) And while Mr. Lekhtman *distinguished* Fujisaki as having "closely spaced" electrodes (JA241), Dr. Galiana opined that the invention works because it "connects both hands to the same point of common potential and uses *closely spaced* electrodes under each hand" (JA1030-31 (emphasis added)). Furthermore, Mr. Lekhtman required the detection of sufficiently equal EMG signals for all levels of grip (*see* JA255-56), while Dr. Galiana did not even mention grip as a relevant variable. And the testimony of Dr. Yanulis likewise demonstrated the ambiguity of the claims by embracing multiple competing interpretations. (*See* JA1670.)

13

Accordingly, a more demanding analysis is required.

## II.  APPLYING THE SUPREME COURT'S STANDARD HERE, A SKILLED ARTISAN COULD NOT DETERMINE THE SCOPE OF THE CLAIMS WITH REASONABLE CERTAINTY IN 1992.

On the day the Lekhtman patent was filed in 1992, the hypothetical person of ordinary skill in the art, handed the issued patent and original prosecution history, would face significant uncertainty regarding what configurations of heart-rate monitor electrodes would safely fall outside the claims. The person most interested in this question would be the skilled artisan wishing to use the prior-art Fujisaki circuit to achieve the Lekhtman patent's desired result (i.e., detecting substantially equal EMG signals) without risking infringement.

### A.  The Claims' Scope Was Unclear Regarding The Electrodes' Spacing And Its Link—If Any—To The Claimed Result.

The skilled artisan in 1992 would not know with reasonable certainty whether the "in spaced relationship" term is critical to—and thus limited by—the claimed result, or, instead, unassociated with the claimed result and effectively not limiting at all. On this question, the original intrinsic evidence pointed in two opposite directions, leaving the claims' boundaries—and thus the potential avenues for follow-on innovation—fundamentally uncertain.

### 1.  Some Clues Suggested That The Spacing Was Critical.

The original intrinsic evidence provided clues to the skilled artisan that "in spaced relationship" might mean a special spacing critical in some way to the

14

recited result. Under this reading of the claims—in which "in spaced relationship" is limited to spacings that cause or contribute to detecting substantially equal EMG signals—the skilled artisan might feel safe pursuing new and improved designs by spacing the electrodes as shown in Fujisaki and innovating in other areas, such as improved materials. In other words, the Fujisaki spacing might be a safe haven for follow-on innovators under this reading.

The first such clue is in the claims. Absent some such special meaning, the term "in spaced relationship" would be superfluous in these claims. Without any context, the term "in spaced relationship" may suggest merely that two items are spaced apart. Here, however, other language in the claims already requires that the electrodes be spaced apart but close enough together to be grasped by a single hand. Specifically, the recitation of a "first live electrode" ("connected to" a "difference amplifier") and a "first common electrode" ("connected to . . . a point of common potential") means that these are two distinctly connected electrodes spaced apart from each other—as does the recitation that both EMG signals and ECG signals are "detected between" these two electrodes. And, the recitation of the user's hand "contacting said first live electrode and said first common electrode" indicates that they are close enough together to be so grasped. Thus, if the term "in spaced relationship" meant only that the electrodes were spaced apart but close enough together to be grasped (as found by the prior concurrence), it

15

would be superfluous. The very inclusion of this term, therefore, is a clue to the skilled artisan that "in spaced relationship" is a special spacing linked somehow to the result recited later in the claim. *See, e.g.*, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (cautioning against "merely superfluous" claim language and instructing that "claims are interpreted with an eye toward giving effect to all terms in the claim").

The second clue suggesting that "in spaced relationship" has some special meaning is in the figures. Relative to the Fujisaki figures, the Lekhtman patent depicts narrow electrodes spaced wider apart than the width of a single electrode— in sharp contrast with the prior-art Fujisaki electrode size (wider) and spacing (significantly narrower than the width of a single electrode). (*Compare* JA2, *with* JA978; *see also* JA3472.) Because the electrode and differential amplifier portion of the circuit disclosed in Fujisaki was identical, and because nothing in the asserted patent claims expressly restricts the electrodes' size, shape, or material, or how firmly they are gripped, the skilled artisan would wonder if "in spaced relationship" captured a distinction between Lekhtman's invention and the prior-art Fujisaki design. Indeed, Mr. Lekhtman's own 2009 declaration argued that this contrast in the electrodes' spacing distinguished the Fujisaki prior art. (*See* JA241, ¶ 79; JA199.)

16

### 2.    Other Clues Suggested That The Spacing Was *Not* Critical.

But, the original intrinsic evidence also provided clues to the skilled artisan pointing in the opposite direction, namely that "in spaced relationship" is *not* linked to or limited by the recited result. Under this opposite reading of the claims—in which "spaced relationship" is superfluous and the only restriction on spacing is that the electrodes be spaced apart and graspable by a single hand—using the Fujisaki spacing was *not* a safe haven from a charge of infringement. Even if the would-be follow-on innovator discovered a new material that achieved the desired substantially equal EMG detection result using Fujisaki's narrow electrodes' spacing, she would risk a charge of infringement under this reading.

First, the claims do not clearly or expressly link the claimed result of detecting substantially equal EMG signals to the electrodes being "in spaced relationship with each other." Some 126 words separate the first mention of "spaced relationship" from the "whereby" clause, which does not reference any preceding element as the cause of its recited result (although it easily could have).

Second, the original intrinsic evidence provides no apparent express or implicit special definition for "in spaced relationship." It does not say that the electrodes' spacing is critical to or even affects the device's operation. It provides no example of a particular spacing that is too wide, or too narrow, or just right. Nor does it describe any advantages or disadvantages of making the gap narrower or

wider. Instead, it simply states that the electrodes are "spaced," "in spaced relationship," or "spaced from" each other.

Third, the skilled artisan would read the examiner's observation, made during the original prosecution proceedings that "the placement of the electrodes in claim 1 *appears not to be critical* to the proper functioning of the device." (JA75 (emphasis added).)

### B.    Simply Choosing One Of These Competing Interpretations Would Not Provide Reasonable Certainty At The Time Of Filing.

These multiple irreconcilable clues created the "innovation-discouraging 'zone of uncertainty'" against which the Supreme Court has warned. *Nautilus II*, 134 S. Ct. at 2130 (quoting *United Carbon*, 317 U.S. at 236). Furthermore, even if this uncertainty were overlooked, and the skilled artisan flipped a coin to guess whether the term was critical or not, the claims still did not particularly point out and distinctly claim the invention. As explained below, even then the skilled artisan would be stymied when trying to decipher and innovate around the asserted claims from the day they issued in 1994.

### 1.    Even Assuming The Spacing Were Clearly Critical, The Claims' Scope Remained Unclear.

Even if "in spaced relationship" were read as critical to the claimed result, the claims' scope still would have been unclear to the skilled artisan at the time of filing in 1992, because the original intrinsic evidence fails to clearly define how it

is critical. For example, does "in spaced relationship" mean a spacing that results from the trial-and-error process described by Mr. Lekhtman 17 years after he filed his patent application? If so, then a follow-on innovator who invented an improved electrode material that *inherently* detected equal EMG signals would not risk infringement, even if that material were used with electrodes that happened to be spaced apart in the manner depicted in the Lekhtman patent. Or, instead, does "in spaced relationship" mean a spacing that causes substantially equal EMG signals to be detected no matter how tightly the electrodes are gripped, as Mr. Lekhtman in 2009 told the Patent Office his invention achieved? If so, a follow-on innovator would not risk infringement if she used an electrode spacing that achieved the desired result for all but the tightest grips and then deactivated the heart-rate monitor when gripped that tightly.

More generally, according to Mr. Lekhtman's 2009 declaration, the detection of EMG signals depends not only on the spacing between the electrodes, but also the "size, shape, and materials" of the electrodes, as well as the user's grip. (JA238; JA255-56). Therefore, even assuming that "in spaced relationship" has a special meaning tied to the claimed result, it still would be unclear whether the skilled artisan in 1992 was free to use any spacing she wished and then manipulate these other variables to achieve the claimed result.

### 2.    Even Assuming The Spacing Were Clearly *Not* Critical, The Claims' Scope Remained Unclear.

Conversely, if the skilled artisan guessed that "in spaced relationship" was *not* critical to the claimed result, the claims still would fail to particularly point out and distinctly claim the invention. The claims then would be directed to using a prior-art circuit structure to achieve an improved result, without specifying the particular way for achieving that result. They would cover *all* future ways of achieving the result of detecting substantially equal muscle (EMG) signals with a Fujisaki circuit, thus foreclosing innovation by a skilled artisan who wished to use the *exact* prior-art configuration and spacing of electrodes depicted in Fujisaki, while developing some means other than the electrodes' spacing to equalize the EMG signals.

That type of claim in essence claims the future; it does not particularly point out and distinctly claim an invention. *See Gen. Elec.*, 304 U.S. at 371-72 (holding that "a characteristic essential to novelty may not be distinguished from the old art solely by its tendency to remedy the problems in the art"); *Halliburton Energy*, 514 F.3d at 1253 (disallowing "claims to cover . . . all future improvements," and holding that "[w]hile patentees are allowed to claim their inventions broadly, they must do so in a way that distinctly identifies the boundaries of their claims").

In *General Electric*, the Supreme Court held invalid as indefinite a claim for a light-bulb filament "made up mainly of a number of comparatively large grains

20

of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life." 304 U.S. at 368-74. The specification did "not attempt in any way to describe the filament, except by mention of its coarse-grained quality," or explain how it differed from the prior art. *Id.* at 373. The only clue the patent provided as to what was covered was the intended result of "prevent[ing] substantial sagging and offsetting." *Id.* at 370. Here, as in *General Electric*, the claims recite a facially vague term, there is close prior art, the original intrinsic evidence provides no illuminating disclosure, and the claims are directed to a result rather than a particular and distinct invention.

## III. MR. LEKHTMAN WAS IN THE BEST POSITION TO AVOID THIS AMBIGUITY, YET HE FAILED TO DO SO.

### A. The Uncertainty Was Avoidable.

This lack of clarity and precision was easily and demonstrably avoidable. If Mr. Lekhtman believed in 1992 what he later professed in 2009—that an *a priori* "balanced" electrode spacing was critical—then he easily could have made that clear in this patent by, for example: (1) explicitly clarifying this link in the claims; (2) disclosing it was critical; (3) explaining how and why it was critical; (4) giving ranges of spacings (and other variables) that achieved the claimed result, or at least providing concrete positive and negative examples of configurations that did and did not achieve the claimed result; and (5) explaining how one of skill in the art could determine whether a particular design would or would not achieve the

claimed result. Mr. Lekhtman was in the best position to resolve the ambiguity in his claims and provide reasonable certainty regarding their scope. But he did not.

Mr. Lekhtman's 2009 declaration was at least 15 years too late to provide certainty to the skilled artisan in 1992. But, it does serve as a beacon illuminating the ambiguities in the claims, and more specifically as an admission that greater clarity was possible than he chose to provide in his patent application. For example, his 2009 declaration disclosed—for the first time—numeric ECG-to-EMG ratios by which to assess the effectiveness of electrode spacings. (JA255-56; JA343.) He described the "inventive concept" of a trial-and-error configuration process not described in the original intrinsic evidence (*e.g.*, JA242), and he explained the purported requirement that substantially equal EMG signals be detected regardless of how firmly the electrodes are grasped (JA255-56).

Of course, Mr. Lekhtman's failure to provide such clarifications in his 1992 application also has consequences under Section 112(a). But that does not make this failure immaterial to the particular-and-distinct claiming analysis. On the contrary, the specification is "the single best guide to the meaning of a disputed [claim] term," and "[p]roperly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips Corp. v. AWH Corp.*, 415 F.3d 1303, 1315, 1321 (Fed. Cir. 2005) (en banc) (quotation omitted); *see also Nautilus II*, 134 S. Ct. at 2124 (focusing on the "claims, read in light of the specification . . . and the prosecution history").

Biosig has suggested that it was difficult to claim the invention more precisely because it truly was a trial-and-error process with many variables. If that were true, however, Mr. Lekhtman could have drafted a product-by-process claim, recited the steps taken to achieve the desired configuration, and provided supporting disclosure therefor. But he did not.

### B.     Biosig's Roller-Coaster Claim-Scope Positions Illuminate The Uncertainty.

Unclear claims are the enemy of innovation in part because they allow patent owners to make up the invention as they go along to suit their economic or litigation needs, long after the patent issues. That is what happened here, where Biosig's own competing interpretations demonstrate the too-malleable scope of the claims. For example, Biosig convinced the district court to ignore Mr. Lekhtman's prior representation that "the space between electrodes is wider than the width of each electrode" (JA241), and secured a broad construction that covers *all* spacings, without any result-based limitation (JA-E). Then, in opposing the indefiniteness challenge that followed, Biosig changed course and argued that the "in spaced relationship" term is limited to spacings that achieve the claimed result. (*See, e.g.*, JA2827 (arguing that "[t]he spaced relationship between the electrodes is one whereby you remove the EMG signal"); JA2836 (arguing that "the functional relationship is the removal of the EMG"); Appellant Opening Br. 45.)

###   C.      Enablement Is Not The Same As Clarity And Precision.

Biosig has suggested that persons of skill in the art knew enough to *practice* the invention. Even if that were so, it would be beside the point. The skilled artisan of importance here is not one trying to practice the invention, as is the case when assessing enablement. Quite to the contrary, here the skilled artisan is trying to *avoid* practicing the invention. She seeks to match or improve upon the result achieved by the claimed invention, *without* using the particular way claimed. This follow-on innovator requires reasonable certainty regarding the *outer limits* of the patent claims, so she can safely innovate around those limits. While providing a full and clear description of the invention in the specification is an important tool for complying with the statute's demand for particular and distinct claims, merely enabling a skilled artisan to practice some embodiment inside the claims' blurry boundaries is not good enough.

### IV.    UPHOLDING THESE CLAIMS WOULD FUEL THE TEMPTATION FOR PATENT APPLICANTS TO GAIN ECONOMIC LEVERAGE THROUGH CLAIM-SCOPE OBFUSCATION.

Patent attorneys are trained to include some ambiguous claims in their patent applications, for obvious economic reasons. *See, e.g.*, Jeffrey G. Sheldon, *How to Write a Patent Application* § 6.5.19, at 6–114 (2005) (containing an entire subsection entitled "Include Ambiguous Claims," which offers drafters more than a dozen "strategies" for "intentionally writ[ing] ambiguous claims"). The Supreme

Court expressly acknowledged the need for "a meaningful definiteness check" in view of these "powerful incentives" and declared that "[e]liminating that temptation is in order," and that "the patent drafter is in the best position to resolve the ambiguity." *Nautilus II*, 134 S. Ct. at 2129.

Allowing the patent claims in suit to stand would have exactly the *opposite* effect. It would amplify the strong economic incentives to claim desirable *results* rather than *particular ways* to achieve those results. It would further encourage drafting of blurry boundaries that can be manipulated to evade prior art and capture subsequent inventions. It would undermine the purposes of the statute by defeating the fundamentally important public-notice function of patent claims as articulated by the Supreme Court, particularly where the uncertainty not only was easily avoidable by the patent applicant but also was exploited by him.

## CONCLUSION

Nautilus respectfully requests that the Court affirm the district court's judgment.

DATED:  August 15, 2014

By:  */s/ John D. Vandenberg*
      **James E. Geringer**
      Email:  james.geringer@klarquist.com
      **Jeffrey S. Love**
      Email:  jeffrey.love@klarquist.com
      **John D. Vandenberg**
      Email:  john.vandenberg@klarquist.com
      **Philip Warrick**

Email:  philip.warrick@klaruquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon  97204
Telephone:  503-595-5300
Facsimile:  503-595-5301

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KLARQUIST SPARKMAN, LLP, Attorneys for Appellee to print this document. I am an employee of Counsel Press.

The undersigned hereby certifies that on August 15, 2014, the foregoing **SUPPLEMENTAL BRIEF OF DEFENDANT-APPELLEE NAUTILUS, INC. FILED PURSUANT TO THE COURT'S JULY 8, 2014 ORDER** was filed with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Mark D. Harris
mharris@proskauer.com
Proskauer Rose LLP
Eleven Times Square
New York, NY, 10036
(212) 969-3000
*(also via Express Mail)*

John E. Roberts
jroberts@proskauer.com
Proskauer Rose LLP
One International Place
Boston, MA 02110
(617) 526-9600

Daniel C. Mulveny
dmulveny@ktmc.com
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Michael J. Bonella
mbonella@condoroccia.com
Todd Kupstas
tkupstas@ktmc.com
Jenna Pellecchia
jpellecchia@ktmc.com
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7056

Paul Milcetic
pmilcetic@ktmc.com
Paul Milcetic, LLC
526 Sproul Road
Villanova, PA 19085
(610) 293-9677

Paper copies will also be mailed on this date to Mr. Harris at the address above.

Six paper copies will be filed with the Court within the time provided in the Court's rules.

August 15, 2014                                              /s/ John C. Kruesi, Jr.
                                                            John C. Kruesi, Jr.
                                                            Counsel Press