Appeal No. 2012-1289

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

BIOSIG INSTRUMENTS, INC.,

*Plaintiff-Appellant,*

– v. –

NAUTILUS, INC.,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 10-CV-7722,
JUDGE ALVIN K. HELLERSTEIN

## PLAINTIFF-APPELLANT'S
## SUPPLEMENTAL BRIEF ON REMAND

DANIEL C. MULVENY
KESSLER TOPAZ
MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

MARK D. HARRIS
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600

*Counsel for Plaintiff-Appellant Biosig Instruments, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellant Biosig Instruments, Inc. certifies the following:

1.    The full name of every party or amicus curiae represented by me is: Biosig Instruments, Inc.

2.    The name of the real party in interest represented by me is: Biosig Instruments, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None.

4.    The names of all law firms and the partners or associates that appeared for the party represented by me in this Court, the Supreme Court, or the trial court, or who are expected to appear in this Court are:

      <u>Proskauer Rose LLP</u> - Steven M. Bauer, Mark D. Harris, John E. Roberts, James H. Shalek, Celia V. Cohen, Anthony H. Cataldo, and Jinnie Reed.

      <u>Kessler Topaz Meltzer & Check LLP (formerly known as Barroway Topaz Kessler Meltzer & Check LLP)</u> – Sean M. Handler, Daniel C. Mulveny, Michael J. Bonella, Paul B. Milcetic, Tod A. Kupstas, and Jenna M. Pellecchia.

      <u>Heidell, Pittoni, Murphy & Bach LLP</u> – Scott Zimmerman, John Bone, and John Charles O'Brien, Jr.

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT .............................................................. 1

THE SUPREME COURT'S DECISION ................................................... 3

ARGUMENT ....................................................................................... 6

    I.     This Court Applied The Correct Test In *Nautilus I* ............................. 6

    II.    All Of The Evidence In The Record Demonstrates That A Skilled Artisan Would Have Understood The Bounds Of Claim 1 ..................................................................................... 10

    III.   Nautilus's Argument That The Members Of This Panel Disagreed Over The Meaning Of "Spaced Relationship" Is Meritless And Irrelevant To Definiteness ...................................... 15

CONCLUSION ................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009) ....................................................................7

*Biosig Instruments, Inc. v. Nautilus, Inc.* ("*Nautilus I*"),
  715 F.3d 891 (Fed. Cir. 2013) ...........................................................*passim*

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002)........................................................................................5

*Gen. Elec. Co. v. Wabash Appliance Co.*,
  304 U.S. 364 (1938)........................................................................................5

*Miles Labs., Inc. v. Shandon, Inc.*,
  997 F.2d 870 (Fed. Cir. 1993) ......................................................................7

*Minerals Separation v. Hyde*,
  242 U.S. 261 (1916)........................................................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.* ("*Nautilus II*"),
  134 S. Ct. 2120 (2014)..........................................................................*passim*

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*,
  758 F.2d 613 (Fed. Cir. 1985) ......................................................................7

*United Carbon Co. v. Binney & Smith Co.*,
  317 U.S. 228 (1942)..................................................................................3, 13

*United States v. Adams*,
  383 U.S. 39 (1966)..........................................................................................5

**Statutes & Other Authorities:**

35 U.S.C. § 112 ...............................................................................3, 18, 20

Fed. R. Civ. P. 56(a)......................................................................................2

## PRELIMINARY STATEMENT

The Supreme Court held that the test for definiteness is whether claim language, when "read in light of the specification delineating the patent, and the prosecution history," "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.* ("*Nautilus II*"), 134 S. Ct. 2120, 2124 (2014).  The sole question on remand is whether Claim 1 of U.S. Patent No. 5,337,753 ("the '753 patent") satisfies that standard.  The answer to that question is "yes" for the same reasons that this Court articulated in its previous decision.

*First,* this Court already employed the correct substantive standard for definiteness.  In their initial opinions, both the majority and the concurrence held that the '753 patent disclosed the "inherent parameters of the claimed apparatus," which were "sufficient for a skilled artisan to understand the bounds" of Claim 1. *Biosig Instruments, Inc. v. Nautilus, Inc.* ("*Nautilus I*"), 715 F.3d 891, 901 (Fed. Cir. 2013); *id.* at 905 (Schall, J., concurring).  Both reached that conclusion after analyzing the claim in light of the specification and the prosecution history and after considering the knowledge of a skilled artisan.  *See id.* at 899-901 (majority op.); *id.* at 905-06 (Schall, J., concurring).  That is precisely the approach that the Supreme Court has now mandated.  Although the Supreme Court took issue with

1

certain phrases that appeared in the Panel's opinions, none of the problematic language drove the Panel's analysis.

*Second*, all of the evidence in the record compels the conclusion that a skilled artisan in 1992—the year the patent application was filed—would have understood the scope of Claim 1. Before the district court were three detailed reports from Biosig's experts in the field concluding that a skilled artisan reading the '753 patent would have known how to ascertain the proper "spaced relationship" between electrodes using minimal testing. In response, Nautilus submitted *no* evidence whatsoever concerning the understanding of a skilled artisan. The completely one-sided nature of the record is particularly significant because this Court is reviewing a grant of summary judgment to Nautilus. Summary judgment would have been appropriate only if the record inexorably supported Nautilus's position. *See* Fed. R. Civ. P. 56(a). Here, not only does the record undercut Nautilus's indefiniteness defense, but all of the evidence points in *Biosig*'s favor. As this Panel previously recognized, there is no basis to hold that Nautilus was entitled to summary judgment in those circumstances.

*Third,* the only arguments that Nautilus has proffered for indefiniteness in this litigation are hypothetical ambiguities in the claim language conjured up by its attorneys—precisely the type of "*post hoc*" argumentation divorced from the skilled artisan that the Supreme Court proscribed in *Nautilus II*. 134 S. Ct. at 2130.

2

In particular, at the Supreme Court, Nautilus relied entirely on a supposed disagreement among the Members of this Panel in their earlier opinions as its "evidence" of indefiniteness. But that purported disagreement rests on a blatant misreading of the opinions. And in all events, a mere difference of opinion among judges regarding the scope of a claim is insufficient to demonstrate indefiniteness.

For these reasons, this Court should reach the same conclusion as it did last time, in reliance on the same evidentiary materials, that the '753 patent is definite and valid. It should therefore reverse the district court's grant of summary judgment to Nautilus.

## THE SUPREME COURT'S DECISION

In *Nautilus II,* at Biosig's urging, the Supreme Court reaffirmed the long-established standard for definiteness in patent claiming. The Court held that the Patent Act (35 U.S.C. § 112, ¶ 2) requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention *with reasonable certainty*." *Nautilus II*, 134 S. Ct. at 2129 (emphasis added). As the Court explained, "reasonable certainty" is not a new standard; it is the degree of clarity in patent claiming that has governed for nearly one hundred years. *See id.* at 2129-30 (citing *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) ("[C]laims must be reasonably clear-cut."); *Minerals Separation v. Hyde*, 242 U.S. 261, 270 (1916) ("[T]he certainty which the

3

law requires in patents is not greater than is reasonable . . . .")).  Notably, the

Supreme Court found that the substance of the Federal Circuit's definiteness

analysis closely tracks the reasonable-certainty test.  *Id.* at 2130.

Although it reaffirmed the reasonable-certainty standard, the Supreme Court

vacated this Court's earlier decision because it disapproved of two phrases

employed by the Panel:  "insolubly ambiguous" and "amenable to construction."

The Supreme Court expressed concern that those locutions could be perceived to

shift the focus of the definiteness inquiry away from the understanding of the

skilled artisan and toward a court's own "*post hoc*" view of the claim language.  *Id.*

As the Court put it, a claim cannot be considered definite merely because a judge

can ascribe "some meaning" to it, if a skilled artisan at the time of patenting could

not.  *Id.*

Critically, the Supreme Court did not indicate that the *Nautilus I* Panel had

been led astray by either of the disapproved phrases.  Its main concern, rather, was

that the use of those phrases by the Federal Circuit could send the wrong message

to district courts and the patent bar.  *Id.* at 2130 & n.8.

In the course of vacating the Panel's earlier decision, the Supreme Court

squarely rejected Nautilus's proposed test for definiteness, namely the radical

contention that a claim fails as indefinite whenever two people "'could reasonably

interpret the claim's scope differently.'"  *Id.* at 2128 (quoting Sup. Ct. Pet'r Br.

37); *see also* Sup. Ct. Pet'r Br. 46 (arguing that a claim is invalid whenever there could be any "[]plausible" disagreement regarding its precise bounds).  Nautilus's approach would have upended patent practice; it would have required every claim to provide not merely reasonable, but *perfect* notice, such that no reasonable person could possibly disagree about its meaning.  As the Supreme Court recognized, however, "absolute precision" in patent claiming is "unattainable." *Nautilus II*, 134 S. Ct. at 2129.  Moreover, Nautilus's rule would have encouraged unscrupulous infringers to raise any superficially plausible reading of patent language in order to assert that its meaning was open to different constructions. Unsurprisingly, the Supreme Court spurned that proposal.

    *Nautilus II* also clarified several principles pertaining to the definiteness standard.  First, definiteness must be evaluated from the perspective of a skilled artisan.  *Id.* at 2128 (citing *Gen. Elec. Co. v. Wabash Appliance Co.*, 304 U.S. 364, 371 (1938)).  Second, the claims must be read in light of the specification and prosecution history.  *Id.* (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 741 (2002); *United States v. Adams*, 383 U.S. 39, 48-49 (1966)).  And third, definiteness must be measured at the time of patent filing (here, June 6, 1992).  *Id.* (citations omitted).

    Finally, the Supreme Court expressed no opinion on the validity of the '753 patent, the matter now again before this Panel.  *Id.* at 2131.  Instead, the Supreme

Court merely recited each party's position as to whether the key claim language was definite and then followed its "ordinary practice" of remanding so that the Federal Circuit could decide that question in the first instance. *Id.* After presenting Nautilus's argument for indefiniteness, however, the Court added a pointed footnote, stating: "Notably, however, all three panel members [in *Nautilus I*] found Nautilus's arguments unavailing." *Id.* at 2131 n.11. Those arguments remain unavailing now.

## **ARGUMENT**

### I.     **This Court Applied The Correct Test In *Nautilus I.***

The test that the Supreme Court announced for definiteness is identical in substance to the one that this Court applied in *Nautilus I.* The Supreme Court held that a patent claim must inform a skilled artisan with reasonable certainty about the scope of an invention. *Nautilus II,* 134 S. Ct. at 2129. This Court held that the claim language must provide "sufficient particularity and clarity to inform skilled artisans of the bounds of the claim." *Nautilus I,* 715 F.3d at 898. Both the Supreme Court's test and the one applied by this Panel focus on the understanding of a person of skill in the art, and both say that the artisan must be able with confidence to determine the invention's scope.

In fact, reasonable certainty has been the standard that the Federal Circuit has followed for decades. Nearly 30 years ago, Judge Newman explained the

Federal Circuit's test for definiteness in words that augur those of *Nautilus II*: "If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985); *see also, e.g., Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1371 (Fed. Cir. 2009) ("If a claim fails to reasonably apprise one skilled in the art of the boundaries of the claim when read in light of the specification, then the claim is invalid under § 112 for indefiniteness."); *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993) ("If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.").

The Supreme Court acknowledged that this Panel had applied a test for definiteness that approximates the statutory prescription. *Nautilus II*, 134 S. Ct. at 2130. Its sole objection to the Panel's decision concerned its employment of the "insolubly ambiguous" and "amenable to construction" phrases. But critically, the Supreme Court gave no indication that it thought the Panel was led astray in *Nautilus I* by the "insolubly ambiguous" or "amenable to construction" language, or that it took any missteps whatsoever in its previous analysis. Rather, the Court worried only that those locutions might "breed lower court confusion" (i.e., in the

7

district courts) or confound the patent bar. *Id.* at 2130 & n.8 (citation omitted). *Nautilus II* is therefore best understood not as a landmark decision, but as a prophylactic one, issued for the benefit of the district courts and patent lawyers, which merely purges from the canon language with the potential to confuse those constituents.

In any event, this Panel plainly did not go astray. Although it did employ the now-disapproved phrases "insolubly ambiguous" and "amenable to construction," it did so only in passing, and it did not substitute its own view for that of the skilled artisan. Rather, this Panel repeatedly and properly trained its definiteness inquiry on the understanding of a person of skill and determined that he would readily understand the bounds of Claim 1. *See, e.g.*, *Nautilus I*, 715 F.3d at 899 ("In this case, a skilled artisan would find [the claim's] boundaries provided in the intrinsic evidence."); *id.* ("[The] claim language, specification, and the figures illustrating the 'spaced relationship' . . . provide sufficient clarity to skilled artisans as to the bounds of this disputed term."); *id.* at 901 ("[The] claims provide inherent parameters sufficient for a skilled artisan to understand the bounds of 'spaced relationship.'"); *id.* at 903 ("[S]killed artisans can readily ascertain the bounds of the 'spaced relationship' through tests using standard equipment."); *id.* (holding that the spacing "can be determined by those skilled in the art"); *id.* at 905 (Schall, J., concurring) (concluding that "intrinsic evidence . . . discloses certain

8

inherent parameters of the claim apparatus, which to a skilled artisan may be sufficient to understand the metes and bounds of 'spaced relationship'" (internal quotation marks omitted)).

Indeed, the Panel's methodology for deciding definiteness was in accord with the Supreme Court's teaching. The Panel "primarily consider[ed] the intrinsic evidence consisting of the claim language, the specification, and the prosecution history," along with pertinent extrinsic evidence. *Nautilus I*, 715 F.3d at 898; *see also id.* at 905 (Schall, J., concurring). On the basis of that evidence, it determined that "the claims provide inherent parameters sufficient for a skilled artisan to understand the bounds" of Claim 1. *Id.* at 901 (majority op.); *see also id.* at 905 (Schall, J., concurring). Specifically, both the majority and the concurrence concluded that the specification, claim language, and diagrams instructed a skilled artisan that the "spaced relationship" within each pair of electrodes had to be somewhere between near-zero and a hand's breadth. *Id.* at 899 (majority op.); *id.* at 905-06 (Schall, J., concurring). To the concurrence, those inherent parameters sufficiently defined the spacing to a skilled artisan. *Id.* at 906. The majority took the analysis a step further and concluded that a skilled artisan would understand that Claim 1's functional limitation placed additional constraints on the "spaced relationship," further buttressing its clarity. But both the majority and the concurrence applied the same standard and the same core methodology.

9

## II. All Of The Evidence In The Record Demonstrates That A Skilled Artisan Would Have Understood The Bounds Of Claim 1.

Even if the Supreme Court had moved the needle concerning the degree of clarity required in claiming (which it did not), Nautilus cannot overcome the glaring fact that *all* of the evidence in the record supports the conclusion that a skilled artisan in 1992 would have known precisely what Claim 1 encompasses. And it is far too late in the day for Nautilus to attempt to refashion the record.

To begin with, as this Panel held previously, the intrinsic patent materials— the claim language, the specification, and the diagrams—all make clear that the "spaced relationship" between electrodes is subject to certain "inherent parameters." The spacing must be greater than zero (else the live and the common electrodes will effectively merge) and less than a hand's breadth (else the user's hand will not be able to grasp both electrodes). *Id.* at 899 (majority op.); *id.* at 905-06 (Schall, J., concurring). Those factors alone, the Panel already determined, are "telling and provide sufficient clarity to skilled artisans as to the bounds of this disputed term." *Id.* at 899 (majority op.); *accord id.* at 905 (Schall, J., concurring).

Additionally, Biosig submitted multiple expert reports and declarations that speak directly to the definiteness question. This undisputed evidence demonstrates that a person of skill in 1992 could have readily determined the magnitude of the "spaced relationship" for a given set of electrodes.

10

Foremost in the record was a declaration from the inventor of the '753 patent, Dr. Gregory Lekhtman, who concluded that a skilled artisan in 1992 would have understood the meaning of the term "spaced relationship" in Claim 1 and would have known how to calculate the appropriate distance between the electrodes. *See Nautilus II*, 134 S. Ct. at 2126. Dr. Lekhtman stated that in 1992, it was common knowledge that EMG potentials as measured are different in the right hand and the left hand. *Nautilus I,* 715 F.3d at 900; *see also* JA 242 (¶ 82).[1] He stated that a skilled artisan would have understood, based on the disclosures in the '753 patent, that it was necessary to equalize those signals, which would require a certain "configuration of the detectors." *Nautilus I*, 715 F.3d at 900. It was further known among skilled artisans that producing a "balanced detection" of EMG signals depended on certain "design variables," including the spacing, size, shape, and materials of the electrodes. *Id.* According to Dr. Lekhtman, the artisan would have known to use a "common analog oscilloscope," which was available in 1992, to measure the EMG signals and determine the optimal spacing. *Id.* To corroborate his assertions about the knowledge and abilities of a contemporary skilled artisan, Dr. Lekhtman appended to his declaration a collection of summaries and article abstracts from 1992, showing that it was commonly known

---

[1] All citations to "JA" refer to the Joint Appendix previously filed with Appellant's opening brief on October 22, 2012.

11

both how to measure EMG signals and which variables affected that measurement. (JA 243 (¶ 90).)

Dr. Lekhtman's conclusions were corroborated by Dr. Henrietta Galiana, Chair of the Biomedical Engineering Department at McGill University in Montreal. In a separate declaration, Dr. Galiana stated that a skilled artisan would understand how to practice the invention taught by the '753 patent. Indeed, she recounted how her own research assistant, in only two hours, was able to build a working model of the heart monitor from scratch (complete with proper electrode spacing), using only "a wooden dowel, wire, metal foil, glue, electrical tape," and the instructions in the patent—a fact that the Supreme Court itself noted. *Nautilus II*, 134 S. Ct. at 2126 n.4. Based on her experience in the field for over 20 years, her knowledge of the level of ordinary skill in the art, and her own review of the patent, she concluded that there was "no doubt" that the patent was sufficiently detailed to have been "fully understood" by a skilled artisan in 1992. (JA 1054 ¶ 60.)

Finally, a third expert in biomedical engineering, Dr. George Yanulis, agreed that a skilled artisan would know how to determine the "spaced relationship" between electrode pairs using the precise type of testing that Dr. Lekhtman described in his declaration. *Nautilus I,* 715 F.3d at 901; *see also* JA 1670. After analyzing the invention and discussing the knowledge of the skilled

12

artisan, Dr. Yanulis concluded that "the claim scope is understandable by a person of ordinary skill in the art." (JA 1659.)

Thus, three experts in the field testified that a skilled artisan in 1992 could have readily ascertained the proper "spaced relationship" between electrodes and therefore would have understood the scope of the claimed invention. This was and remains crucial evidence of definiteness. *See Nautilus II*, 134 S. Ct. at 2130 (noting that "claim construction . . . may turn on evaluations of expert testimony").

In response, Nautilus offered *no* testimony or other evidence suggesting that a skilled artisan at the time of patenting would have had any difficulty understanding what is claimed by the '753 patent. Instead, throughout this litigation, Nautilus has proffered only a series of arguments conjured up by its attorneys to demonstrate some supposed lack of clarity in the patent. That total lack of proof is fatal to Nautilus's position.

Nothing in *Nautilus II* calls into doubt the Panel's reliance on Biosig's expert declarations. Indeed, it is well-established that expert testimony regarding the understanding of a skilled artisan is relevant to the definiteness analysis. *See, e.g.*, *United Carbon*, 317 U.S. at 233-34. Moreover, the Supreme Court's extensive citations to, and quotations from, Biosig's declarations are a clear indication that the Court thought that they were probative of definiteness. *See Nautilus II*, 134 S. Ct. at 2126-27 & n.4.

13

It is of no moment that the Lekhtman and Galiana declarations were drafted a number of years after the patent was filed.  Their function in this litigation was not to put the world on notice about the meaning of Claim 1, but rather to supply evidence of how a skilled artisan would have interpreted Claim 1 in 1992.  Thus, whether the declarations were submitted during the original prosecution, during the re-examination, or even during the district-court litigation is immaterial; either way, they support the conclusion that a skilled artisan could readily determine the bounds of Claim 1's "spaced relationship," and thus they are relevant to the issue under appeal.

Nor is it significant that the Yanulis declaration in one instance referred to the now-disapproved "insolubly ambiguous" and "amenable to construction" language.  (JA 1670.)  Dr. Yanulis is an expert and a scientist, not a judge; he was not opining on how a court might understand Claim 1 but rather on how a skilled artisan would.  After defining the level of knowledge of a person skilled in the relevant art, he repeatedly stated that such a skilled artisan could "readily discern the claim scope of the '753 patent claims, including the 'spaced relationship' . . . ." (*Id.*)  Plainly, he was applying the proper standard.

14

### III. Nautilus's Argument That The Members Of This Panel Disagreed Over The Meaning Of "Spaced Relationship" Is Meritless And Irrelevant To Definiteness.

Before the Supreme Court, having failed to present *any* evidence that a skilled artisan has ever actually been confused about the scope of Claim 1—or even expert testimony suggesting that such confusion was theoretically possible— Nautilus relied exclusively on a supposed disagreement between the Judges on this Panel. According to Nautilus, the Members of this Panel were fundamentally at odds about the meaning of the term "spaced relationship" in Claim 1. In Nautilus's view, the majority believed that the claim covered only electrode configurations that canceled out the EMG signals in each hand, thereby enabling measurements of ECG signals. (Sup. Ct. Pet'r Br. 48.) The concurrence, on the other hand, purportedly believed that *any* method of cancelling out EMG signals would be covered, even if it did not involve electrode spacing—such as using additional circuitry (*id.*) or adding a protective "sleeve" over the electrodes (Sup. Ct. Pet'r Reply Br. 20). The existence of such a "stark[]" disagreement proved, Nautilus argued (Sup. Ct. Pet'r Br. 48), that the claim language was ambiguous and indefinite.

Nautilus's argument fails for at least two reasons. *First*, there simply was no disagreement between the Members of this Panel over anything beyond a minor procedural matter. The majority's analysis proceeded in two steps. It began by

15

looking at the '753 patent specification and diagrams, from which it concluded that the space between electrodes could not be wider than a hand's breadth, and could not be so small that the electrodes merged. *Nautilus I*, 715 F.3d at 899. In the majority's view, those inherent parameters alone rendered the term "spaced relationship" definite. *Id.* The majority then proceeded to examine Claim 1's "whereby" clause, which explains that the claimed device must substantially remove EMG signals. *Id.* The majority viewed that clause as "shed[ding] further light" on the term "spaced relationship." *Id.* As the majority noted, the record shows that a skilled artisan reading the patent would understand that EMG removal is accomplished by manipulating the spacing between electrodes (or, alternatively, electrode size, shape, or composition) until EMG detection is equal at the left and right electrode pairs. *Id.* at 900-01. Consequently, the majority held, a skilled artisan could determine the precise spacing for a given set of electrodes through simple testing of EMG detection at both sides of the monitor. *Id.* at 901.

Judge Schall did not think that the definiteness analysis needed to proceed as far as the majority took it. He would have accepted the district court's construction of "spaced relationship" as simply meaning a space, because that construction had not been conditionally cross-appealed. *Id.* at 906 (Schall, J., concurring). Judge Schall found the term "spaced relationship" definite because the '753 specification limited the space to between near-zero and a hand's width. *Id.* at 905-06. Those

16

inherent parameters sufficiently circumscribed the "spaced relationship," and, in Judge Schall's view, no further analysis was necessary.  Thus, Judge Schall did not *reject* the majority's construction of the "whereby" clause; he just did not think that it was necessary to decide the appeal.  *Id.* at 906.

Before the Supreme Court, Nautilus turned Judge Schall's embrace of judicial restraint on its head.  Nautilus contended that Judge Schall had concluded that there was "no functional linkage between the invention's goal of eliminating muscle signals and the configuration of the electrodes" (Sup. Ct. Pet'r Br. 48 (quotation marks omitted))—in other words, that he believed that the "whereby" clause was unconnected to the term "spaced relationship."  That is simply wrong: Judge Schall, in fact, expressed no opinion on that question.  He believed that "spaced relationship" was *ipso facto* definite, so it was unnecessary to consider its relationship to the "whereby" clause.  But were he to construe Claim 1 as a whole, there is no reason to doubt that he would conclude, as the majority did, that the "whereby" clause requires the electrodes to be spaced in such a way that the EMG signals detected at both sets of electrode pairs are equal.

Indeed, Nautilus itself previously acknowledged that the "whereby" clause is inextricably intertwined with the claimed "spaced relationship."  During the *Markman* proceedings below, Nautilus explained that the "whereby" clause

17

requires the claimed monitor to detect equal EMG signals on its left and right

sides; and that equalization is accomplished by the configuration of the electrodes:

> This is a result that flows from the structure.  If you have
> your electrodes balanced they will feed substantially
> equal muscle signals into the diff amp.  And we know
> equal things get cancelled in the diff amp. . . . *So this
> whereby clause just feeds substantially equal muscle
> signals in on each side . . . .*

(Tr. Aug. 11, 2011 Hearing (Dist. Ct. Dkt. No. 33) at 29:6-13 (emphasis added);

*see also* Nautilus's Opening Claim Constr. Br. (Dist. Ct. Dkt. No. 20) at 7-8 ("It is

therefore clear that the 'whereby' clause above, requires that the electrodes be

'balanced.'").)  Nautilus's position at the Supreme Court was therefore flatly

inconsistent with the one that it took before the district court.  (*See* Sup. Ct. Pet'r

Br. 48.)

In any event, even if the Judges on this Panel did disagree on the precise

meaning of the "spaced relationship" limitation, it would be irrelevant because

there is no indication that they disagreed on the scope of Claim 1 *as a whole*,

which is all that matters for the definiteness inquiry.  *See* 35 U.S.C. § 112, ¶ 2

(stating that a *claim* must "particularly point[] out and distinctly claim[]" the

invention).  The majority took a holistic approach to Claim 1 and discussed the

interplay between the "spaced relationship" and the "whereby" clause.  Judge

Schall, by contrast, believed that any connection between those two limitations was

not before the Court, and he thus decided definiteness on narrower grounds. *Nautilus I*, 715 F.3d at 906 (Schall, J., concurring). Indeed, the concurrence deliberately did *not* opine on the "whereby" clause and its connection to the "spaced relationship." *Id.*

*Second*, even if there were a disagreement among the members of this Panel regarding the scope of Claim 1, that would be insufficient to establish an ambiguity in the claim language. Judges who sit on panels disagree every day over the meaning of written instruments such as statutes and contracts (and, yes, patents); that does not make those instruments ambiguous. Were a judicial disagreement sufficient to demonstrate indefiniteness, then no patent owner could ever appeal an adverse claim construction because a panel of this Court disagreeing with a district judge over the meaning of a claim would automatically render the claim indefinite.

Ironically, Nautilus's argument is exactly the type of *post hoc* reasoning untethered to the knowledge of a skilled artisan that the Supreme Court disapproved in *Nautilus II*. Nautilus claims an ambiguity and "zone of uncertainty" (Sup. Ct. Pet'r Reply Br. 20) in the patent based purely on lawyer's arguments and purported disagreements among judges—and without *any* evidence concerning how a person of skill would understand the challenged claim. The teaching of *Nautilus II* is that such arguments do not go any distance toward showing indefiniteness because they are divorced from the skilled artisan.

19

The district court committed a similar error:  It disregarded the skilled artisan's knowledge and understanding in favor of its own reading of the patent. (*See* JA 2834-36.)  Rather than consider Biosig's unrebutted testimony that a skilled artisan reading the '753 patent in 1992 would have understood how to readily ascertain the "spaced relationship," the district court found the patent indefinite because *the judge* did not understand how to fix the spacing of the electrodes.  (*See, e.g.*, JA 2825-27.)  In so holding, the judge incorrectly considered how the patent read to him, rather than how the skilled artisan would have understood it.

At bottom, Nautilus's unyielding focus at the Supreme Court on the purported disagreement between the majority and concurrence underscores the inherent weakness of its position.  Bereft of evidence, Nautilus had no choice but to manufacture a dispute among the Judges on this Panel to support its indefiniteness position.  But in so doing, Nautilus mischaracterized the rationales employed by this Panel and highlighted its own lack of support in the record.

## **CONCLUSION**

Paragraph 2 of § 112 serves an important purpose of protecting the rights of innovators.  It was not enacted, however, to shield infringers who can conjure up unfounded theories of hypothetical confusion.  Nautilus has provided no evidence that it or any skilled artisan would have fallen prey to any of the speculative

uncertainties that it has advanced during this litigation. To the contrary, all of the evidence shows that a person of skill fully understood what is encompassed by Claim 1. This Court already has all the tools needed to perform an analysis similar to that in *Nautilus I*, without resort to the "insolubly ambiguous" and "amenable to construction" language that the Supreme Court considered problematic. Nautilus's indefiniteness argument should therefore be rejected, and the decision of the district court should again be reversed.

August 15, 2014

Respectfully submitted,

s/ Mark D. Harris
MARK D. HARRIS

DANIEL C. MULVENY
KESSLER TOPAZ
MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

MARK D. HARRIS
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600

*Attorneys for Plaintiff-Appellant Biosig Instruments, Inc.*

# CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by PROSKAUER ROSE LLP, Attorneys for Plaintiff-Appellant to print this document.  I am an employee of Counsel Press.

The undersigned hereby certifies that on August 15, 2014, the foregoing **Plaintiff-Appellant's Supplemental Brief on Remand** was filed with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

James E. Geringer
Jeffrey S. Love
John D. Vandenberg
Philip Warrick
Klarquist Sparkman, LLP
One World Trade Center
Suite 1600
121 S. W. Salmon Street
Portland, OR 97204
503.595.5300

*Attorneys for Defendant-Appellee*

Six paper copies will be filed with the Court within the time provided in the Court's rules.

August 15, 2014
/s/ Robyn Cocho
Robyn Cocho
Counsel Press